BARRY R. FEERST & ASSOCIATES (BRF-3836)
Attorneys for Plaintiff
194 South 8th Street
Brooklyn, New York 11211
t(718)384-9111
f(718)384-5999

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x
BORIS SHAULOV,

                                        **AMENDED**
                                  **COMPLAINT AND JURY DEMAND**

            Plaintiff,

                                    Plaintiff demands
        - against -                 Trial by Jury

                                    1:18-cv-04151

THE CITY OF NEW YORK, THE KINGS
COUNTY DISTRICT ATTORNEY'S OFFICE,
TINA FAY,  RACHEL WAGSHUL and JOHN DOES
1-10 the identities of whom are
presently unknown, in their
individual and official capacities
as employees of the defendant entities,

            Defendants.
--------------------------------------x

    Plaintiff  BORIS  SHAULOV,  (hereinafter  "Shaulov"  or

"Plaintiff") by his attorneys, Barry R. Feerst & Associates,

complaining  of  the  defendants  herein,  respectfully  allege  as

follows:

### INTRODUCTION

    1. Shaulov brings this action under 42 U.S.C. § 1983 and New

York State law, seeking to recover damages caused by the denial of

his legal and constitutional rights and wrongful conviction and

1

loss of liberty .

2.    Shaulov was wrongfully convicted after  his wrongful prosecution, and imprisonment caused by the pervasive misconduct of the  Brooklyn  District  Attorney's  Office  ("BDAO").  Shalouv's conviction was produced by perjured testimony, and prosecutorial misconduct which resulted in his denial of his right to have a fair trial.

3.    In 2015, the  court  of  appeals  reversed  shalouv's conviction. Thereafter on July 23, 2015, the Kings county district attorneys office dismissed all charges.

4.  Shalouvs' wrongful  conviction  was  caused  by  Defendants' unlawful and unconstitutional acts, omissions, polices, customs and practices.

5. This lawsuit seeks to hold the defendants CITY OF NEW YORK and KINGS COUNTY DISTRICT ATTORNEY's OFFICE ["BDAO"] liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1883, and Monell v. Dept Of Social Services, 436 U.S. 658 (1978). The unlawful actions of prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and  customs  to  violate  the  constitutional  rights  of  criminal suspects  and  defendants,  or  from  deliberate  indifference  by policy-making officials acting on behalf of the City of New York, to such violations. As plaintiff will demonstrate the BDAO, as a matter of policy, unlawfully concealed exculpatory or impeachment

2

evidence known as "Brady" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior. In the rare case where such misconduct was exposed, these agencies took no disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those directed against plaintiff.

6. The principal individual defendant, acting pursuant to unlawful municipal policy, who caused Plaintiff's unconstitutional detention is Assistant District Attorney TINA FAY ("Fay). Despite her position as an Assistant District Attorney, ethically obligated to pursuant to the canons of ethics to "do justice" FAY engaged in a series of deceptive and unlawful practices, all caused by and consistent with her Office's unlawful policies, in order to continue to detain and eventually convict Shalouv.

7. The BDAO through the Kings County District Attorney, Charles A. Hynes defense of FAY  and ratification of her unlawful behavior, his unwillingness to even investigate, let alone discipline FAY, for her documented misconduct in Plaintiffs and other cases, was consistent with Hynes's pattern, throughout his 20 year tenure as District Attorney, of refusing to ever investigate or impose meaningful discipline on dozens of prosecutors found in court decisions to have engaged in misconduct including deliberate misconduct. Exhibit "A" contains a list and description of a

plethora of cases in which courts found Brady and related discovery or due process violations by Brooklyn prosecutors, but as to which Hynes conducted no meaningful internal investigation and imposed no disciplinary sanctions on the offending prosecutors.

8. Hynes' overall deliberate indifference to the very types of constitutional violations that occurred in this case was a substantial cause of the misconduct of FAY and other Hynes's employees aimed at plaintiff, and thus exposes defendant CITY OF NEW YORK, for whom Hynes was the chief policymaker in the management and administration of the BDAO, a City agency, to federal civil rights liability under Monell for plaintiff's damages.

9. Shalouv's wronful conviction was also the product of RACHEL WAGSHUL("Wagshul") who malicioously concocted a story that she was raped by Shaulov. Wagshul testimony was perjury. who lied under oath knowingly lied a fabricated a fictional story and perjumanafacuted

10. Defendants suppressed Brady information, fabricated evidence, used improper methods in order to deny Shalouv's rights to a fair trial.

11. Defendants' suppression of Brady information, fabrication of evidence, subornation of perjury, and impoprper condcut were caused by the express or de facto policies of the BDAO under former District Attorny Charles J. Hynes.

4

12. In 2015, The Court of Appeals dismissed the claim against Shaulov and ordered a mistrial, due to prosecutorial misconduct and on July 23, 2015, the State of New York decided to withdraw all claims against Shaulov.

## JURISDICTION

13. This Court has federal jurisdiction pursuant to 28 U.S.C 1331 over claims arising under 42 U.S.C. § 1983.

14. Supplemental jurisdiction over Shaulov's state law claims exists pursuant to 28 U.S.C. § 1367(a).

15. Shaulov has complied with the statutory requirement to service a notice of claim on the State of New York. More than 30 days have elapsed since service of said notice and no offer of settlement has been made.

## VENUE

16. Pursuant to 28 U.S.C. § 1391(b) venue is proper in the Eastern District of New York, the judicial district in which the claim arose.

## JURY DEMAND

17. Pursuant to the Seventh Amendment of the Constitution of the United States, the Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

18. Plaintiff BORIS SHAULOV is an adult resident of the State of New York and County of Kings.

5

19. Defendant City of New York("NYC"), of which Kings County a subdivision, is a municpalicy and a political subdivision of the State of New York, existing by virtue of the laws of the State of New York. Defendant NYC is and was at all times relevant responsible for the policies, customs, and practices of the BDAO.

20. Defendant TINA FAY("Fay") at all times relevant, was an assistant district attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs and usage of the State of New York and City of New York and BDAO, and acted within the scope of her employment. She is sued in her individual and her official capacity.

21. Defendant the DISTRICT ATTORNEY OF KINGS COUNTY at all times was and is a lawfully existing municipal corporation.

22. Defendant RACHEL WAGSHUL is an adult resident of the State of New York and County of Kings.

23. Defendants JOHN DOES 1-10 are, upon information an belief, at all times relevant were acting as agents, servants and employees of co-defendant municipal corporations and are sued in their individual and official capacities.

## **NATURE OF THE ACTION**

24. This action arises under the Constitution and laws of the United States, particularly 42 U.S.C. §§ 1983, 1985 and 1988 and the laws of the State of New York for the malicious prosecution of SHUALOV for the rape that never happened of Defendant RACHEL

6

WAGSHUL.

## THE FACTS

25. On or about December, 2009, RACHEL WAGSHUL brought formal charges against SHAULOV alleging that he unlawfully engaged in sexual acts with RACHEL WAGSHUL, on March 11, 2009 at 9:15 p.m. at the residence of SHAULOV, a few weeks before RACHEL WAGSHUL 17th birthday.

26. RACHEL WAGSHUL had actual knowledge that those claims were false and malicious and that SHAULOV and RACHEL WAGSHUL were not even in the same location at 9:15 p.m., the time the alleged criminal act occurred.

27. For at March 11, 2008 at 9:15 p.m., SHAULOV was alone in his residence together with the two defendant parol officers, evidenced by the logs that were entered into contemporaneously with their visit held by the New York State Department of Probation.

28. Nonetheless, RACHEL WAGSHUL pursued her claim with the full knowledge that her claims were bogus and improperly wanted to abuse the judicial system to harm SHAULOV.

29. RACHEL WAGSHUL brought the claims with malice and without probable cause.

30. As a result of that complaint, SHAULOV was arrested by officers of the New York City Police Department on September 2, 2009 and was placed in custody.

### Mr. Shaulovs' Prosecution and Trial

7

31. The trial was relatively straightforward. WAGSHUL alleged that less than two months before her 17th birthday she and Shaulov, who was then 23 years of age, engaged in intercourse and oral sexual contact. (Shaulov was found not guilty of all charges regarding lack of actual consent but was found guilty of the age inappropriate counts.)

32. Prior to trial, the court held pretial hearings. "Let us move on to any issues that you might have that you might want to give the Court a heads up on,"

The People(Fay) proffered that the complainant:

"does not disclose what happened to her until several months later."

"She first disclosed it to her family relative and then later on maybe a week or so later, she discloses to people in her school ... The People would ask that we be allowed to brihg in a rape trauma expert. Now, of course, the rape trauma expert would come in if counsel opens the door to it, and I believe that counsel probably will."

33. After that proffer by the prosecutor and the Court ruling was in place, the rape trauma expert would be permitted to testify. Counsels opening statement emphasized that complainant did not tell her mother, or call 911 or tell her friends.

34. The complainant, in direct contradiction to The People's proffer and counsel's opening statement made in reliance upon that

proffer, was permitted, over objection, to testify that she told

her friend Shaina immediately when she emerged from the subway that

indeed the incident occurred

    Q: In the days and in the weeks after this happened

did you say anything to anybody? Did you tell anyone?

    A: I told Shaina when I got out of the train, but I

didn't tell her the whole story.

Q: Okay, is that the conversation that you referred to

earlier as having had with her when you got out of the

train?

A: Yes.

Q: So, what did you tell Shaina on the phone?

A: I told her, I just told her what happened, I just

didn't tell her the whole story.

Q: When you say that you told her what happened,

what do you remember telling her?

A: I didn't tell her that I didn't want that to happen.


    35. Counsel was surprised by the testimony. He objected and

moved for a mistrial. Significantly whether the complainant told

Shaina that she "didn't want" to have sex with the defendant was

irrelevant to the conviction. The conviction was based upon the

fact that the complainant alleged she was six weeks shy of her 17

birthday when she had sex with the defendant. Defendant was found

9

not guilty on the issue of consent. Thus, complainant's testimony that she merely omitted "that I didn't want it to happen" was irrelevant.

36. The significance of the prompt outcry evidence was not lost on the jury. Almost immediately after receiving the case for deliberations, the jury asked for a read back of the prompt outcry to Shaina: "We will like to see Rachel say about what she said to Shaina." [sic]

37. Any evidence of complainant's immediate outcry to Shaina should have been precluded given the prosecutor's proffer that the outcry was delayed. Counsel relied upon the proffer in his voir dire and opening statement.

38. Clearly, Fay prepared Wagshul for her testimony.

39. Fay knew that Wagshul would elicit the aforementioned testimony despite promising the court that Wagshul "does not disclose what happened to her until several months later"

40. The defense attacked the evidence on two fronts. The complainant had motive to lie. Defendant had driven the complainant to a parking lot under the Verrazano Bridge. After a verbal argument the defendant drove off leaving the complainant stranded at that distant location. Moreover, the defense produced evidence that at the time of the alleged rape, defendant was the subject of a home visit with his supervising probation officer (defendant was on probation based upon an unrelated conviction for driving on a

suspended license)

41. Shaulov was not with Wagshul at the time she alleged the sexual acts occurred. He was at home being interviewed in a home visit by two New York City probation officers based upon a sentence of probation he was then serving on an unrelated case. Moreover, Wagshul had a motive to lie. Shaulov had insulted her and left her stranded without a ride home near the Verrazano Bridge.

42. To prove that Shaulov was engaged in a home visit with the Department of Probation, counsel had subpoenaed the Department of Probation for records of the home visit. Pursuant to his subpoena for the records of the Department of Probation's home visit with the defendant, the department had initially responded by producing only the document that eventually was admitted into evidence as defendant's Exhibit A. The document contains an entry that defendant was present at a home visit at 21:12 Hours on March 11, 2009. The equivalent civilian time, of course, is 9:12p.m., a time that Wagshul, taken together with the telephone records, alleged was precisely in the middle of the time Shaulov was with Wagshul and committing the acts alleged in the indictment.

43. When, pursuant to the subpoena, the Department of Probation produced Probation Officer Usamah for trial testimony, he brought with him two additional exhibits that had not been submitted to the Court in response to defense counsel's subpoena. Those two exhibits went into evidence as Exhibits B and C.

11

Probation Officer Usamah gave Counsel Exhibits B and C when he appeared at trial for testimony but would not discuss any aspect of the reports or his testimony. He essentially refused to be prepared to testify by counsel.

44. Prior to Probation Officer Usamah testifying, Fay objected to his testimony in its entirety and thereafter to any entry concerning any other probationers that were visited on March 11th. Fay was seeking to preclude material exculpatory evidence. Absurdly, Fay objected to the probation officer's testimony because he was not the actual person who made the home visit. Fay noted:

"But moving on from there, counsel has now presented me with more documentation from the Department of Probation and I'm assuming that he is going to ask that the person that testifies, Mr. Washington (sic), get in all of these entries. And all these entries, with the exception of one, have nothing to do with what happened on March 11. So, it is The People's argument that none of these entries should come in."

45. Fay requested:

"I don't think that the jurors should be permitted to see other visits or other entries that might have been made by the probation officer, whose name was Jonathan Beden. I think that the only thing that the jurors should see, and I don't even think they should see that, but the only thing that the jurors should see, in accordance with The Court's ruling, is the visit made to Boris Shaulov and

12

that's it" (Trial Transcript p. 204)

46. The Court went on to order that references to other probationers be redacted and it appears that it was redacted for Exhibit A, but not necessarily for Exhibits B and C. Looking at Exhibit C one can see the sequence of what the district attorney argued was irrelevant entries regarding other probationers that were the subject of home visits on March 11, 2009. The entries start with the notation 2:56p (rather than p.m.) and continue three pages to 10:52 (without a notation of a.m. or p.m.). The first 10 entries contain a "p" after the time in the column that states "When The Visits Began And Ended." The only logical inference is that all the entries were p.m. This is true because the column starts at p.1 at 2:56p. There is no possible inference that 2:56 could be a.m. Probation officers do not conduct home visits at 2:56 a.m. in the middle of the night. Moreover, the visits are in quick succession from 2:56 through the 9:12 entry referring to the defendant and beyond. These are without question p.m. visits, exactly what the prosecutor sought to preclude and improperly argued against in summations.

47. Fay, however, did not miss the issue. On summation, now having thelast word, given the fact that the defense summation had already been completed, the district attorney argued facts that mislead the jury as to the issue of a.m. or p.m. as stated in the documents:

"So, let's look at the evidence that was presented to you. You were presented with two handwritten documents and one typed up. The handwritten documents all indicate that the time that the probation officer went there was about 9:12. There is no indication on the handwritten document whether the 9:12 was a.m. or p.m. No indication. Three weeks later, on March 31, 2009, we see an indication that connotes a time in military time. So, the time reads 21:12. Referring to the time 21:12 is something that you don't see on the handwritten version. I submit to you, ladies and gentlemen, you know what this means? That you don't know whether the probation officer went to the house at 9:12 in the morning or 9:12 at night."(Trial Transcript p. 283)

48. Here the prosecutor improperly encouraged an inference that is utterly belied by Exhibit C and the full record of the time that the other probationers were visited. The Probation officer had indeed spoken to Fay and  she  was aware that the other visits demonstrated that the visits took place in the p.m. not the a.m. Furtl1er support in the record can be seen by Fay not asking the probation officer witness anything regarding a.m. or p.m. designation and waiting until after summation to argue it in the final summation of the prosecutor to the jury, well after everything else in the trial had been said.

49. Fay's misrepresentation of the evidence  totally debunked the defense that the defendant was with his probation officer at

14

9:12p.m. It was not a truthful statement and it was a misrepresentation of Exhibit C. This was clearly a misrepresentation and, if the jurors believed the home visit was at 9:12p.m. they would not have convicted Shaulov.

50. The documentary evidence presented thru the Probation Dept. business records. In the instant case Exhibits "B" and "C" demonstrate that like Exhibit "A" there was proof positive that defendant was the subject of a home visit (wherein he was present) at the time period that it was alleged he raped the complaining witness. The prosecutor did not question the Probation Officer with respect to whether Exhibits "B" and "C" demonstrated (as did Exhibit "A") that the home visit occurred at 9:12 in the evening. The prosecutor nonetheless argued on summation that the record of 21:12 hours was unreliable because it was entered weeks later by an unknown employee of the Department of Probation rather than Exhibits "B" and "C" which were recorded by the actual probation Officer, and recorded contemporaneously, but were equivocal as to morning or night. Upon inspection of Exhibits "B" and "C" it is clear that both exhibits unequivocally demonstrate that the home visits conducted by defendant's probation officer that day, all happened between 2:00 PM and approximately 10:30 PM.

51. The District Attorney's argument to the contrary was in violation of defendant's state and federal due process rights. The prosecutor knew, thru conversation with the Probation Officer, that

the two documents produced at the trial demonstrated that the home visit occurred during the PM hours rather than as the prosecutor argued on summation, that the hour of the visit could have been in the AM hours.

52. Prejudice clearly exists because if the jury knew that all three exhibits demonstrated PM visits, they would have had to find the defendant not guilty because the phone records admitted into evidence and The Peoples entire theory, argued that the rape occurred during the time of the home visit. Moreover, exculpatory evidence in the hands of the department of probation, under the circumstances of this case must inure to the knowledge of The People. It was the Probation Officer who refused to speak to Counsel, but evidently had indeed spoken to the prosecutor, before testifying.

53. In 2015, the court of appeals reversed Shaulov's conviction. Thereafter on July 23, 2015, the Kings county district attorneys office dismissed all charges against Shaulov.

**Damages**

54. As a proximate result of the defendants' wrongful conduct and Mr. Shaulovs' resulting wrongful conviction and loss of liberty, Mr. Shaulov has suffered Physical injuries he suffered during assaults by other inmates, and the mental and emotional effects of such assaults and of the gruesome and terrifying assaults on other inmates he witnessed, Past and future physical

16

illnesses and injuries as a result of his wrongful imprisonment and his experiences in prison currently suffers, and will continue to suffer from pecuniary and non-pecuniary injuries, including past, present, and future physical, mental, emotional, and psychological damages; past, present, and future loss of income and earnings; past, present, and future reputational harm; and past, present, and future legal and medical fees and costs.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

Denial of Due Process and a Fair Trial(U.S. Constitution Amendments IV, V, VI, XIV)

55. Paragraphs "1." through "54." are repeated.

56. Defendants knowingly and intentionally manufactured, or caused the manufacturing of, false evidence that they knew would and intended to be used against Mr. Shaulov at his trial, namely, Wagshuls' false testimony.

57. Defendants knew and intended that the false evidence would deprive Shaulov of a fair trial and result in his wrongful conviction and incarceration.

58. Defendants, with actual malice, continued or caused the continuation of criminal proceedings against Shaulov for which they knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Shaulov to be deprived of his liberty

17

59. Defendants knew and intended that Brady information – including The parol officer visit, facts contradicting her testimony, the improper methods used to induce her false testimony, and documents and other information supporting the defense case – would be concealed from Shaulov and his attorney.

60. Defendants caused said Brady information to be concealed from Shaulov and his attorney by failing to disclose it, conspiring to suppress it, and inducing others not to disclose it.

61. The criminal proceedings terminated in Mr. Shaulovs' favor.

62. Defendants' conduct, committed in concert with one another and/or others, deprived Shaulov of his rights under the United States Constitution: (a) not to be prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading "evidence," including the testimony of Wagshul who was improperly influenced, coerced, and/or manipulated to give false testimony, and whose testimony defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; (b) not to be deprived of his liberty absent probable cause, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and (c) to timely disclose of material evidence favorable to the defense under Brady, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the

United States Constitution.

63. Defendants' acts and omissions proximately caused the continuation of Mr. Shaulovs' criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

64. Defendants committed the foregoing violations, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Shaulovs' constitutional rights.

### **SECOND CAUSE OF ACTION**

### **42 U.S.C. § 1983**

Denial of Due Process and a Fair Trial (U.S. Constitution Amendments V, VI, XIV)

65. Paragraphs "1." through "64." are repeated.

66. Fay, acting in an investigative capacity, knowingly and intentionally manufactured, or caused the manufacturing of, false evidence that he knew would and intended to be used against Shaulov at his trial, namely, Wagshul's false testimony.

67. Fay knew and intended that the false evidence would deprive Shaulov of a fair trial and result in his wrongful conviction and incarceration.

68. Fay, with actual malice, caused the continuation of criminal proceedings against Shaulov for which she knew, or should have known, there was no probable cause, and for which in fact

19

there was no probable cause, and thereby caused Shaulov to be deprived of his liberty, by manufacturing false evidence.

69. Fay's conduct, committed in concert with her codefendants in this action and/or others, deprived Shaulov of his rights under the United States Constitution: (a) not to be prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading "evidence," including the testimony of Wagshul who was improperly influenced, coerced, and/or manipulated to give false testimony, and whose testimony defendants knew was false, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and (b) not to be deprived of his liberty absent probable cause, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

70. Fay's acts and omissions proximately caused the continuation of Shaulovs' criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

71. Fay committed the foregoing violations, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Shaulovs' constitutional rights.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Dep't of Soc. Svcs., 436 U.S. 658 (1978)*

*Against Defendant City of New York*

72. Paragraphs "1." through "71." are repeated.

73. At the time of Shaulovs' prosecution, and continuing through the time Shaulov's conviction was reversed by the New York Court of Appeals, former District Attorney Charles J. Hynes, as the manager, chief administrator and policy-maker of the Brooklyn District Attorney's Office, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn.

74. Among other things, Assistant District Attorneys and District Attorney's Office investigators engaged in a custom and practice of: (a) manufacturing false evidence and testimony through improper coercion of witnesses; (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing Brady information; and (d) covering up these unlawful practices.

75. These policies, customs, and practices began with Mr. Hynes' induction as District Attorney in 1990 and persisted through at least 2012.

76. Mr. Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the District

21

Attorney's Office, particularly in serious cases where arrest and conviction was most desired by the Office.

77. These policies, customs, and practices proximately caused the violations of Shaulovs' constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

78. Mr. Hynes' policy was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of Brady information. Mr. Hynes' deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Shaulovs' case.

79. Under Mr. Hynes' office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any record of Brady information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information is recorded in written form.

80. Mr. Hynes' training and discipline policies and practices were likewise consciously designed to permit and encourage Brady violations.

81. Prosecutors and investigators were trained on avoiding the creation of Brady and Rosario material, instructed not to disclose Brady information if they could rationalize non-disclosure by

subjectively assessing the information as unreliable, and encouraged to cover up Brady information kept hidden by other members of the District Attorney's Office.

82. Prosecutors were permitted and encouraged not to comply with the Office's ongoing Brady obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and/or through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the District Attorney's Office and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

83. Through a policy, custom, and practice of not disciplining prosecutors or investigators for Brady or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), Mr. Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with Brady and other constitutional requirements.

84. Mr. Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for Brady or other constitutional violations by prosecutors or investigators.

85. Despite tons of court decisions, many of which are listed

23

in Exhibit "A", finding that prosecutors had wrongfully failed to disclose information as required under Brady, Rosario, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and/or defense attorneys, none of the prosecutors involved was disciplined.

86. Under Mr. Hynes' policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

87. Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.

88. No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

89. To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, Mr. Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it. Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions.

90. During depositions in *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y), Mr. Hynes' former Chief of Investigations, Dennis Hawkins, and former Counsel to the District Attorney, Dino Amoroso, acknowledged that there was no formal

24

disciplinary procedure or policy for prosecutorial or police misconduct committed by District Attorney's Office employees, and they were unaware of any prosecutor ever being disciplined during Mr. Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution. In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

91. Mr. Hynes' office likewise had no formal policy requiring disclosure of Brady information or any written policy on how to disclose it.

92. Mr. Hynes' office provided no training on how to question or evaluate informant or accomplice witnesses.

93. Mr. Hawkins testified in the *Zahrey* case that, despite having virtually daily contact with Mr. Hynes over many years, he never heard Mr. Hynes discuss the training of prosecutors in such areas.

94. Even after judgments were entered against District Attorney's Office-affiliated individual defendants in the Zahrey case and other, similar civil rights lawsuits, Mr. Hynes' office conducted no investigation and imposed no discipline on any of the employees involved.

95. A number of cases handled by Mr. Hynes' office evidence the above policies and practices of encouraging and tolerating misconduct by District Attorney's Office staff.

96. Early in his tenure, Mr. Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 152 (1992), a case where the District Attorney's Office secured a murder conviction by arresting and threatening a 17 year-old witness with prosecution and imprisonment until she agreed to testify against the defendant. In reversing that conviction, the court condemned the "egregious" behavior of the Brooklyn District Attorney's Office in "'legally' coerc[ing] testimony." Id. (citing Rochin v. California, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). The Court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

97. No training or disciplinary action was taken to remedy the misconduct exposed in the Russ case.

98. Other examples of the District Attorney's Office's practice of improperly coercing false testimony and Mr. Hynes' endorsement of that practice include the cases of Jabbar Collins (1995) and Ruddy Quezada (1993), in which the prosecution's key witnesses were secretly arrested and threatened with imprisonment (and, in Mr. Collins' case, physical violence) if they did not testify for the prosecution.

99. Mr. Hynes vigorously defended both cases, including after

26

both the suppression of Brady information and improper coercion of witnesses were brought to light, and approved of the conduct of his prosecutors and investigators in those cases.

100. In 1994, Mr. Hynes ratified the misconduct of his Office in the Sarni Leka murder prosecution. Shortly after the 1990 conviction, Mr. Leka moved to vacate his conviction because the prosecution had actively suppressed a variety of Brady information. Not only did Mr. Hynes's office vigorously oppose the defendant's motion and appeal, but Mr. Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected." In 2001, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the Brooklyn District Attorney's Office had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identifications witnesses having recanted their testimony, the Brooklyn District Attorney's Office was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

101. No training or disciplinary action was taken to remedy the misconduct exposed in the Leka case.

27

102. The violations of Shaulovs' constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Shaulov, subject to investigation and prosecution by the Brooklyn District Attorney's Office, including:

a. The institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

i. the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

ii. the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

iii. the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution

28

witnesses; and

b. the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

103. The foregoing express or de facto policies, practices, and customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the then-Brooklyn District Attorney and his delegates, who knew to a moral certainty that such policies, procedures, regulations, practices and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

104. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances: as noted above, numerous credible allegations,

many substantiated by judicial decisions, that prosecutors and investigators wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under Brady, had presented or failed to correct false or misleading testimony and argument, and/or had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the Brady rule and the failures of New York City or Brooklyn prosecutors with that rule; judicial decisions putting the Brooklyn District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their Brady and related due process obligations including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g., Walker v. City of New York*, 974 F. 2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001), *Leka v. City of New York*, 04 CV 8784 (DAB) (S.D.N.Y.), and *Zahrey v. City of New York*, 98 Civ. 4546 (DCP) (S.D.N.Y.); the need to train, supervise and discipline prosecutors and investigators in their aforementioned constitutional obligations to counteract the inherent pressure on

30

prosecutors to obtain convictions.

105. Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City, including the Brooklyn District Attorney's Office, perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs; did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutor s who had engaged in Brady violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practice and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

106. The aforesaid policies, practices and customs of Defendant City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Shaulovs' rights under the Constitution and laws of the United States, and in causing his wrongful conviction and resulting damages.

107. Under the principles of municipal liability for federal civil rights violations, the Brooklyn District Attorney (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence or Brady material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

108. Mr. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance and its duties.

109. The Brooklyn District Attorney at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant City, and the Office was and is funded out of the City's budget.

110. Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New

York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

111. At all relevant times, Mr. Hynes, personally and/or through his authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

112. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Shaulovs' constitutional rights and his resulting injuries

### FOURTH CAUSE OF ACTION

**Malicious Prosecution (Under New York State Law)**

113. Paragraphs "1." through "112." are repeated.

114. The individual defendants, acting in concert with one another and/or others, continued and caused the continuation of criminal proceedings against Shaulov at a time when there was no probable cause for continuation of the criminal proceedings.

115. By the day Wagshul testified at the latest, probable cause for the continuation of criminal proceedings against Shaulov did not exist. The individual defendants, who knew Wagshul was

33

testifying falsely about what had occurred, knew that there was no probable cause for Shaulovs' continued prosecution.

116. The criminal proceedings terminated in Shaulovs' favor.

117. The individual defendants acted for improper purposes and with actual malice.

118. Defendant City of New York is liable under the doctrine of respondeat superior.

### FIFTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress (Under New York State Law)**

119. Paragraphs "1." through "118." are repeated.

120. The individual defendants engaged in a continuing pattern of extreme and outrageous conduct directed at Shaulov from at least his indictment, through the time the New York Court of Appeals reversed his conviction.

121. The individual defendants engaged in that pattern of conduct with the intent of causing, or with reckless disregard for the substantial probability that it would cause, severe emotional distress to Shaulov.

122. The individual defendants' actions proximately caused severe emotional distress to Shaulov.

123. Defendant City of New York is liable under the doctrine of respondeat superior.

### SIXTH CAUSE OF ACTION

**Negligent Training, Supervision, and Discipline (Under New York State Law)**

124. Paragraphs "1." through "123." are repeated.

125. The City of New York, intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline agents and employees of the Brooklyn District Attorney's Office with regard to the matters described above.

126. The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Shaulovs' wrongful conviction and resulting damages.

WHEREFORE, Plaintiff Boris Shaulov demands judgment against the above-captioned Defendants as follows:

a. For compensatory damages in an amount to be determined at trial, but not less than 20 million dollars;

b. For punitive damages against the individual defendants in an amount to be determined at trial, but not less than ten million dollars;

c. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. §1988 and other applicable laws;

d. For pre- and post-judgment interest as allowed by law; and

e. For such other relief as this Court deems just and proper.

BARRY R. FEERST & ASSOCIATES

By: _____/s/_____
Barry R. Feerst (BRF-3836)

                                        Attorneys for Plaintiff
                                        194 South 8th Street
                                        Brooklyn, New York 11211
                                        t(718)384-9111
                                        f(718)384-5999


Dated: Brooklyn, New York
       January 7, 2019

Exhibit      "A"

People v. Murphy, 109 A.D. 2d 895 (2d Dep't 1985) (prosecutor failed to timely disclose Brady material)

People v. Perez, 65 N.Y. 2d 154 (1985) (prosecutor committed Rosario violation by failing to disclose documentation indicating key witness accepted bribe);

People v. Gairy, 116 A.D. 2d 733 (2d Dep't 1986) (prosecutor failed to timely disclose Brady material);

People v. Ranghelle, 69 N.Y. 2d 56 (1988) (prosecutor failed to obtain and disclose Rosario material);

People v. Lugo, 153 A.D. 2d 761 (2d Dep't 1989) (prosecutor's suppression of Rosario material required reversal of conviction);

People v. Cortez, 149 Misc. 2d 886 (Sup. Ct., Kings Co. 1990) (prosecutors and police violated Brady and court order by intentionally destroying tape containing impeachment material);

People v. Nedrick, 166 A.D. 2d 725 (2d Dep't 1990) (prosecutor failed to disclose taperecorded impeachment material);

People v. Anderson, 160 A.D. 2d 806 (2d Dep't 1990) (prosecutor failed to timely disclose impeachment material);

People v. Brazzeal, 172 A.D. 2d 757 (2d Dep't 1991) (prosecutor gave an improper and prejudicial summation);

People v. Faison, 176 A.D. 2d 752 (2d Dep't 1991) (prosecutor failed to timely disclose witness' prior statement);

People v. Crespo, 188 A.D. 2d 483 (2d Dep't 1992) (mistrial granted due to prosecutor's Brady violation);

People v. Brown, 187 A.D. 2d 437 (2d Dep't 1992) (trial court sanctioned prosecutor for Brady violation);

People v. Young, 155 Misc. 2d 878 (Sup. Ct. Kings Co. 1992), on remand.from, 79 N.Y. 2d 365 (1992) (failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony);

Walker v. City of New York, 974 F. 2d 293 (2d Cir. 1992) (Second Circuit upheld Monell claim against City of New York for unlawful policies of Brooklyn District Attorney's Office that allegedly resulted in withholding of Brady material causing plaintiff s wrongful conviction and 18-year imprisonment;

People v. Donald Giddings, 2/21/92 NYLJ 25 (col. l) (Sup. Ct., Kings Co. Feb. 21, 1992) (prosecutor's failure to disclose witness' prior inconsistent statements required conviction to be vacated);

People v. Cecora, 186 A.D. 2d 215 (2d Dep't 1992) (prosecution and police failed to disclose interview notes containing potential impeachment information);

People v. Hughes, 181 A.D. 2d 132 (2d Dep't 1992) (hearing required regarding prosecution's failure to disclose exculpatory police report);

People v. Inswood, 180 A.D. 2d 649 (2d Dep't 1992) (prosecution's failure to turn over Brady material was error);

People v. Jackson, 198 A.D. 2d 301 (2d Dep't 1993), affirming 154 Misc. 2d 718 (Sup. Ct., Kings Co. 1992) (prosecutors failed to timely disclose exculpatory statements; conviction reversed);

People v. Stevens, 199 A.D. 2d 441 (2d Dep't 1993) (Rosario material "improperly" withheld as well as Brady material; prejudice not sufficient to require reversal);

People v. Khadaidi, 201 A.D. 2d 585 (2d Dep't 1994) (conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement);

People v. Alvarado, 201 A.D. 2d 486 (2d Dep't 1994) (prosecution failed to disclose police reports containing impeachment material; conviction reversed);

People v. Barnes, 200 A.D. 2d 751 (2d Dep't 1994) (prosecutor did not record and did not disclose eyewitness' recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined);

People v. Bramble, 207 A.D. 2d 407 (2d Dep't 1994) (sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);

People v. Roberts, 203 A.D. 2d 600 (2d Dep't 1994) (prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed);

People v. Neptune, 161 Misc. 2d 781 (Sup. Ct. Kings Co. 1994) (prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the District Attorney's office);

People v. Scott, 216 A.D. 2d 592 (2d Dep't 1995) (prosecutor suppressed reports, including polygraph results indicating key witness was withholding information);

People v. Ramos, 166 Misc. 2d 515 (Sup. Ct. Kings Co. 1995) (due to District Attorney's Office policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds);

People v. Rahman, 231 A.D. 2d 745 (2d Dep't 1996) (matter remitted for hearing concerning prosecution's apparent improper withholding of witness' cooperation agreement);

People v. Perkins, 227 A.D. 2d 572 (2d Dep't 1996) (prosecutor failed to disclose cooperation agreement with witness);

People v. Scott, 88 N.Y. 2d 888 (1996) (prosecution failed to disclose statement regarding polygraph result);

People v. Callendar, 227 A.D. 2d 499 (2d Dep't 1996) (conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement);

People v. Bruce, 224 A.D. 2d 438 (2d Dep't 1996) (conviction reversed for prosecutor's failure to produce police reports containing impeachment material);

People v. Dupont, Kings County Ind. No. 6287/97 (Feldman, J.) (prosecutor made misrepresentation by claiming District Attorney's Office did not possess physical evidence specifically requested by the defense);

People v. LaSalle, 243 A.D. 2d 490 (2d Dep't 1997) (conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation);

People v. Gourgue, 239 A.D. 2d 357 (2d Dep't 1997) (prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed);

People v. Hill, 244 A.D. 2d 572 (2d Dep't 1997) (prosecutor sanctioned for failing to disclose 911 tape);

People v. Gramby, 251 A.D. 3d 346 (2d Dep't 1998) (prosecutor suppressed and failed to timely disclose 911 tape);

People v. Green, 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct., Kings Co., Oct. 19, 1999) (prosecution failed to disclose Brady material);

People v. Bond, 95 N.Y. 2d 840 (2000) (myriad Brady violations established at Criminal Procedure Law Section 440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to prosecution's failure to

disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness");

People v. Davis, 709 N.Y.S. 2d 345 (Sup. Ct. Kings Co. 2000) (prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed);

People v. Campbell, 269 A.D. 2d 460 (2d Dep't 2000) (prosecutor's suppression of Rosario material, a tape-recorded statement by the complainant, required reversal of conviction);

People v. Calabria, 94 N.Y. 2d 519 (2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);

People v. Campos, 281 A.D. 2d 638 (2d Dep't 2001) (prosecutor failed to timely disclose Brady material; prejudice not sufficient to require reversal);

Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) (conviction overturned on habeas review due to prosecution's suppression of Brady material; prosecutor also misled defense counsel regarding a crucial witness);

People v. Maddery, 282 A.D. 2d 761 (2d Dep'' 2001) (prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction);

Boyette v. LeFevre, 246 F.3d 78 (2d Cir. 2001) (conviction vacated on habeas review because prosecutors suppressed Brady material);

People v. Cannon, 191 Misc. 2d 136 (Sup. Ct. Kings Co. 2002) (prosecution accountable for failure to preserve surveillance photographs);

People v. King, 298 A.D. 2d 530 (2d Dep't 2002) (prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed);

People v. Jenkins, 98 N.Y. 2d 280, 287-88 (2002) (Kaye, C.J., dissenting) (prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable);

People v. Vielman, 31 A.D. 3d 674 (2d Dep't 2006) (reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury");

People v. Jones, 31 A.D. 3d 666 (2d Dep't 2006) (prosecution fails to correct the false testimony of a key witness);

People v. Thompson, 54 A.D. 3d 975 (2d Dep't 2008) (prosecutor suppressed Brady material indicating someone other than the defendant committed the crime);

Waston v. Greene, 2009 WL 5172874 (E.D.N.Y. 2009) (prosecutors disclosed Brady material "too late" for the defense to make use of it even though they were aware of material "more

than a year in advance of trial");

<u>People v. Malik</u>, 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (prosecution's suppression of police report and other documents required vacatur of conviction);

<u>People v. Fuentes</u>, 12 N.Y. 3d 259 (2010) (prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate").